1815.

WILLIAMSON
v.
WILLIAMSON.

———⟡·✲·⟡———

July 17th.

PETER WILLIAMSON *against* JANE WILLIAMSON.

A decree of divorce, *a vinculo matrimonii,* though the adultery is fully ascertained, is not granted, *of course,* in all cases.

If the husband, subsequently to the adultery, cohabits with his wife, with knowledge of her guilt, it is a remission of the offence, and a bar to a divorce.

Lapse of time, also, or a long acquiescence of the husband, without any disability on his part to sue, will be a bar to a prosecution for a divorce.

As, where a husband having been absent from his wife for *eight* years, in a foreign country, and she supposing him to be dead, married another person ; and the first husband, afterwards, returned, and finding his wife cohabiting with her second husband, without taking any steps to obtain a divorce, went abroad and continued absent for *twenty years,* and then returned again, and filed a bill for a divorce against his wife, who was living with her second husband, by whom she had several children ; the court, though the counsel of both parties consented to a decree, dismissed the bill, with costs.

* See *Williamson v. Parisien, ante,* p. 389.

THIS was a bill for a divorce.* The plaintiff stated, that, in 1780, he was married to the defendant, in the city of *New-York,* where they both resided. That at the time of adultery charged, the plaintiff was, and still is, an inhabitant of, and resident within this state. That during the absence of the plaintiff, on a sea voyage, the defendant, on the 20th of *April,* 1814, committed adultery with *Philip Parisien,* and had abandoned the plaintiff, and since lived with the said *Parisien,* &c.

The *answer* of the defendant admitted the marriage with the plaintiff ; and that, while the plaintiff was absent, on a foreign voyage, having heard, and believed, he was dead,

she married with *Philip Parisien*, and had since lived, and still lives, with him as his wife.

The *master's report* stated, that the defendant was the wife of the plaintiff; and that she had, for a long time, cohabited with *P. Parisien*, as his wife, and had a child by him, and still lived and cohabited with him; and that the adultery charged was sufficiently proved.

A witness, whose testimony was stated in the master's report, deposed, that the defendant married *Parisien* some years ago, on a report of the death of the plaintiff, and had since lived with him as his wife, and had a child by him, about four years old; that the plaintiff returned to *New-York* about three years before, or in *June*, 1812, and solicited the defendant to return to him, which she refused to do.

The *affidavit* of the plaintiff, which was admitted in evidence by the consent of the counsel of both parties, stated, that the plaintiff resided in *New-York* from 1779 to the 29th of *June*, 1783; that he married the defendant in 1780, and had three children by her; that he was absent from the state from *June*, 1784, to *June*, 1792; that, at his departure, he left the sum of 240 dollars with the defendant, and had frequently written to her during his absence; that he took with him all his other property, and lost it by shipwreck, which induced him to remain absent until he could earn something for himself and family, which having effected, he returned to *New-York*, in *June*, 1792, and found his wife cohabiting with *Parisien*. This event induced him to depart again from *New-York*, and he remained absent until *June*, 1812, when he returned, and has since resided, and intends permanently to reside, here.

The bill and answer were filed in *June*, 1815, on the same day, *by consent*; and the *report* of the master, and the affidavit of the plaintiff, were all submitted to the court, *by consent*; the counsel, on both sides, expressing their wishes that a divorce might be granted.

VOL. I.          3 Q

WILLIAMSON
v.
WILLIAMSON.

*Vide ante,* p.
389.

*Tucker,* for the plaintiff.

*Burr,* for the defendant.

THE CHANCELLOR.   The plaintiff comes not as a *novus hospes* into this court.   It is but a few weeks since I dismissed the bill between these very parties,* and a new suit for a divorce has since been instituted, by consent, and brought to a hearing, according to its regular order, on the calendar; and from some negotiation, or accommodation, which does not appear, and to which I mean not to be a party, by giving it any facility, a decree of divorce, though strongly resisted in the former cause, appears now to be a matter of consent and solicitude on both sides.   The facts have, accordingly, been very sparingly detailed, but those that are shown, appear to me to be quite sufficient to disclose the merits of the case; and, if it had been otherwise, I should not have very willingly moved until they had been disclosed.   To guard against all kind of improper influence, collusion, and fraud, it is the policy of the law not to proceed upon the ground of the *consent* of parties, to a dissolution of the marriage contract, and I shall consider this case precisely as if a serious controversy existed, and the parties stood adversely to each other, upon their respective rights arising out of the case.

It is not for me to say, whether the statute is too severe in applying, indiscriminately, to *every* case of a divorce for adultery, the prohibition to the party convicted to marry again, though the adultery may have been committed by a remarriage after the absence of the other party for five years, and accompanied with very credible information, or with the presumption and belief, of his death.   The ecclesiastical law will not admit any such presumption of death to excuse the guilt of the second marriage, holding it to be no public inconvenience that the wife should remain a widow; but a very great inconvenience, and a violation of the sanctity of the contract, that she should marry again.

under any circumstances, during the lifetime of her first husband. (*Fournel, Traite de l'Adult.* part 1. ch. 6. art. 2. sect. 3.) In *Holland*, however they have guarded against the occurrence of this inconvenience, by a general ordinance authorizing the courts to allow a second marriage, if the husband is absent for five years without being heard of. (*Voet*, lib. 23. tit. 2. *de ritu nuptiarum*, sect. 99.) But whatever opinion may be entertained of the policy of that provision in our statute, I cannot think the statute intended that the party injured should be entitled to come, *at any time*, and *in every case*, and to put the cause on the single dry question, has an act of adultery, in judgment of law, been committed? Nothing could operate more unjustly than such a construction. The statute says, that, after the truth of the adultery charged shall have been ascertained, " it shall be lawful for the court" to decree a dissolution of the marriage. This language may, and ought to be understood, as leaving to the court the exercise of that sound discretion which the nature of the case, and the principles of equity, might require. The general rules of the *English* jurisprudence, on this subject, must be considered as applicable, under the regulations of the statute, to this newly-created branch of equity jurisdiction. It is not to be supposed that the statute intended, in all cases of adultery charged and proved, that the court should be absolutely bound (no matter under what circumstances) to grant to the prosecutor the effect of a suit carried on for his own benefit. It is to be recollected, that a bill for a divorce is not a public, but a private prosecution, brought at the instance of the party aggrieved, and subject to his control. Cases may be stated of adultery proceeding from surprise, error, the previous consent of the husband, or followed by his subsequent reconciliation, or long acquiescence, in which it is admitted, by all the authorities on this subject, that it would be repugnant to the principles of reason and justice, that the husband should be permitted to prosecute his wife ; and by the ec-

clesiastical law, the husband cannot obtain a divorce for adul-

tery, if the wife recriminates, and can prove infidelity on his part. (*Oughton's Ordo Judiciorum,* vol. 1. tit. 214. *Burn's Ecclesiastical Law,* tit. *Marriage,* sect. 11. *Fournel, Traite de l'Adult.* p. 71. 128. *Dig.* 48. 5. 13. 5.) It was observed, in reference to one of the instances I have supposed, by the late Ch. J. *Parsons,* (and it is not in my power to avail myself of more respectable authority,) that it would be unjust and immoral for the husband to claim and enjoy the society of his wife after a knowledge of her offence, and then be permitted to cast her off for that same offence, and dissolve the marriage. (6 *Tyng's Rep.* 147. *Anon.*) It is, indeed, a general principle, recognised as every where pervading this branch of jurisprudence, that subsequent cohabitation with the wife, with knowledge of her guilt, is a remission of the offence, and a bar to a divorce.

I think enough has been said to show, that a decree for a divorce is not to be taken as *of course,* though the fact of adultery may have existed; and I cannot but persuade myself, that when the statute created a jurisdiction in this court, for the cautious and limited exercise of the power of divorce, it intended that those settled principles of law and equity on this subject, which may be considered as a branch of the common law, should be here adopted and applied.

The lapse of time will, also, and on the soundest principles of justice and policy, form another exception to the right of prosecution for a divorce. An acquiescence of five years, without any existing disability, was, by the civil law, and is, by the law of the continental nations who have adopted the civil law, a bar to a prosecution for adultery. (*Dig.* 48. 5. 1. 29. *et* 31. *Voet,* h. t. n. 22. *Ibid,* lib. 44. 3. n. 7. *in fine. Fournel, Traite de l'Adult.* p. 67.) The injured party is presumed to have pardoned or remitted the offence. We find no certain rule on this point in the *English* law, because, since the time of *Elizabeth,* (see *Rye* v.

*Fuliambe, Moore*, 683.,) divorces, *a vinculo*, are not granted for adultery, except by act of parliament; but a limitation is imposed by the rules of parliament, as by a standing order of the commons, (of the 10th of *June*, 1773, and see the old rule in 8 *St. Tri.* 35. n.,) no bill of divorce for adultery can pass until an action for *crim. con.* has been prosecuted at law, to judgment, or sufficient cause shown why it has not; and we know that six years is a bar to such a suit. Long acquiescence will, under our law, bar a prosecution for any other civil injury, and why not for this? Why may not the court in this, as in other cases, raise presumptions in bar by analogy to the statutes of limitation? We may, perhaps, venture to say, that to sustain a bill of divorce for adultery, after the husband (as in this case) has acquiesced under a knowledge of it, for twenty years, would be repugnant to the institutions of all mankind.

In the present case, the husband returned in 1792, and found his wife recently married, in consequence of his long absence of eight years, and presumed death. Why did he not then reclaim her, or prosecute? He did neither; but departed again from this state, and lived continually abroad, for 20 years, acquiescing in this second marriage, and suffering her offence to aggravate and become inveterate. She has had several children, and has spent the best part of her life in connexion with her present partner. If ever lapse of time, or long acquiescence, formed a just bar to this kind of prosecution, this is one. Can it be fit, or decent, or useful, that without any reason or apology for this delay, he should now be permitted to come into court to expose and disgrace this woman? Most certainly not; and I shall, accordingly, decree that this bill be dismissed, with costs.