## McARTHUR vs. CARRIE'S ADM'R.

[DETINUE FOR SLAVES.]

1. *Struck jury.*—The court is not required (Code, § 2264) to be active in assigning a struck jury, and is not bound to grant one, on demand of either party, unless the demand is made before the organization of the jury is entered upon.

2. *When motion to suppress deposition must be made.*—The statute (Code, § 2328) requiring that a motion to suppress an entire deposition must be made "before entering on the trial," the court may properly refuse to entertain such motion after the trial has commenced, although the party's attorney states that, "in the hurry of preparation for trial, he had forgotten to make the motion" at the proper time, and offers to let the cause stand in the same position before the court as though it had been made at the proper time.

3-4. *Amendment of sheriff's return.*—A sheriff may, by leave of the court, amend his return on a writ in detinue, according to the facts, so as to make it show that his seizure of slaves under it was discharged, by order of the plaintiff's attorney, before the slaves were seized under a second writ; and such amended return relates back to the time when it ought to have been made.

5-6. *Relevancy of evidence affecting validity of sale by administrator.*—Where the validity of a sale by an administratrix is at issue, in an action brought by the administrator *de bonis non* against one claiming under the purchaser, the declarations of the administratrix, expressing her opinion that the sale was good, are not admissible evidence for the purchaser; nor can he be

allowed to prove that the administratrix applied the proceeds of sale to the support and education of the intestate's children.

7. *Ratification by distributees of unauthorized sale by administrator.*—The distributees' receipt of property, bought with the proceeds of an unauthorized sale by the administrator, as a part of the assets of the intestate's estate, cannot operate a ratification of the sale, unless they were of lawful age at the time they received it, and knew with what funds it had been bought.

8. *Admissibility of administrator's declarations as evidence for his successor.*—The declarations of an administrator in chief, who has made a sale of property belonging to the estate, to the effect that the sale was private, are not competent evidence for a succeeding administrator, who seeks to recover the property from one claiming under the purchaser.

9. *Mississippi statute forbidding private sales by administrators.*—Under the Mississippi statute of 1821, (Hutchinson's Miss. Code, 669, § 109,) as shown in the record in this case, a private sale by an administrator, of the property of his intestate's estate, is void.

10. *Against whom detinue lies.*—Detinue does not lie against one who has been dispossessed of the property by legal process, unless the legal custody of the property has terminated before the levy of the writ: if the property is in the sheriff's actual possession when the writ is issued and put into his hands, having been seized under a previous writ against the same defendant, at the suit of a former administrator of the plaintiff's intestate, it cannot be taken under the second writ, unless the first levy was dismissed before the second writ was issued.

11. *Presumption of title to personalty from twenty years possession.*—Proof of the uninterrupted adverse possession of personal property for twenty years raises a *prima-facie* presumption of title and ownership, which can only be overturned by proof showing that such possession is not inconsistent with the plaintiff's right, or explaining and excusing the long acquiescence on some other ground than original defect of title in the possessor.

APPEAL from the Circuit Court of Tallapoosa.

Tried before the Hon. JOHN GILL SHORTER.

THIS action was brought by Walter W. Carrie, as administrator of Henry W. Carrie, deceased, to recover certain slaves, to-wit, Fanny and her four children, which were claimed by the defendant, John McArthur, under a purchase by his father from Mrs. Amelia Carrie, the widow and administratrix in chief of said Henry W. Carrie, deceased; and was commenced on the 11th day of August, 1853. The defendant pleaded "not guilty, in short by consent, with leave to give in evidence such matter as could be specially pleaded in bar." The bill of exceptions purports to set out all the evidence which was offered on the trial, and which was, in substance, as follows:

"After the parties had announced [themselves ready

for trial], the court directed them to submit their cause to jury No. 2, and called on the plaintiff to accept or reject said jury. The plaintiff thereupon objected to one of said jurors, and accepted the others; and the defendant, being then called upon to pass on the jury, replied by demanding a struck jury; which the court refused to grant, and the defendant excepted. The defendant then rejected one of said jurors, and accepted the balance; and the jury was then completed by the addition of two other acceptable jurors in place of the two thus rejected."

" The plaintiff then offered in evidence his letters of administration on the estate of said Henry W. Carrie, deceased, which were granted by the probate court of Tallapoosa county, a short time before the commencement of this suit, while the slaves sued for were in said county. At this stage of the cause, the defendant's counsel stated to the court that, in the hurry of preparation for trial, he had forgotten to move to suppress the deposition of Lewis Daniels, which had been taken by the plaintiff without first making the affidavit required by law; and asked leave to make said motion then, for the reason specified, and offered to let the cause stand in the same position before the court as though the motion had been made at the proper time, and that the plaintiff might have the same right to move a continuance if the deposition was suppressed. The court refused to suppress the deposition, or to allow the motion to suppress to be then made; and the defendant excepted."

The plaintiff then read in evidence the sheriff's endorsement on the writ in this case, showing his seizure of the slaves in controversy, and proved by the sheriff the value of each one of the slaves. " The sheriff stated, on cross examination, that at the time the writ in this case was served by copy on defendant, and by taking the slaves, said slaves were in the county jail of Tallapoosa, where they had been placed by him a few days before, by virtue of another writ against this defendant, in favor of Mrs. Amelia Carrie, as administratrix of said Henry Carrie, deceased; which writ was issued by the clerk of this court, on the 3d day of August, 1853, and placed in the

hands of the sheriff on the same day to be executed."
The sheriff further stated, on cross examination, "that
he had the slaves in his possession, by virtue of said pro-
cess, on the 11th August, 1853, when he was informed by
plaintiff's attorney that he should not give bond for them,
and was then instructed by the said attorney, as the de-
fendant had not given bond, to discharge said order of
seizure, and to make a new seizure under the writ in this
case; that said attorney further stated to him at the same
time, that he had not intended to give bond from the first,
but only wanted to catch the property under the first
writ, and then take out letters of administration *de bonis*
*non* in this county, and sue out a new writ in favor of such
administrator *de bonis non;* that this conversation, together
with the instructions to dismiss the first and make another
seizure, was had at the court-house; that his best impres-
sion was, he then went to the jail, some two or three
hundred yards off, and made the new seizure and service
as they appear in his endorsement; and that the defendant
was present, claiming and demanding the slaves, but wit-
ness utterly refused to let him have them. The witness
was then asked, if he had been instructed to dismiss the
levy under the first writ, why he had not done so by some
entry on said writ; to which he replied, that he had; but,
on examining said writ, he admitted that he had not, and
that it appeared from the records of the court, when ex-
amined, that no entry of dismissal had been made in said
suit, until the fall term, 1854, but that he had been directed
by plaintiff's attorney to discharge the seizure under the
first writ before the property was taken under the present
writ; further, that he had no claim on his part to the
slaves, and that he held them in the meantime, between
the direction to discharge the first seizure and the seizure
in this case, under the instructions to make the new seiz-
ure, as the property of the defendant, and refused to let
him have them."

The plaintiff then suggested to the sheriff, that he had
better amend his return on the first writ, so as to make
it correspond with the facts above stated; and the court
having decided, against the defendant's objection, that

the amendment might be made, the sheriff then signed an amended return, which was written out for him by the plaintiff's attorney, in these words: "By virtue of instructions from the plaintiff's attorney, who says that plaintiff will not give bond to take said slaves into his possession, and instructing me to discharge the seizure, I hereby discharge said seizure or levy under this writ, this 11th August, 1853." The defendant excepted to the allowance of this amendment, and also to its admission in evidence, but the court admitted it as evidence; "and the sheriff then again stated, on further cross examination, that he did not part with the possession of said slaves, nor let them out of the jail, before he made the last seizure or levy."

It appeared that the slave Fanny, the mother of the other slaves in controversy, belonged to said Henry W. Carrie, deceased, at the time of his death, which occurred at his residence in Hancock county, Mississippi, in the year 1828; that Mrs. Amelia Carrie, the widow of the deceased, there took out letters of administration on his estate, returned the slave Fanny in her inventory of the assets of the estate, and, some time in 1829 or 1830, sold said slave to the father of the defendant in this suit, for $400; and that said slave, with her increase, was held by said McArthurs, father and son, under said purchase, in the State of Mississippi, until March, 1853, when they were removed by said defendant to Tallapoosa county in this State. In March, 1853, the court-house of said Hancock county, Mississippi, was burned down; and all the records of the probate court, containing the papers which related to the estate of said Henry W. Carrie, deceased, were destroyed. Secondary evidence of the contents of these papers, and particularly in reference to the sale of said slave by the administratrix, was introduced by both parties; consisting of the depositions of persons who had held the office of clerk of said court, and others who were present at or connected with the sale. The evidence adduced by the plaintiff tended to show that said sale was private, while that adduced by the defendant tended to show that it was public. One Roan, a witness for the

defendant, who testified to the public character of the sale of the slave, further testified as follows : "After paying her husband's debts, Mrs. Carrie laid out the balance of the money in a stock of cattle, with which means she raised and educated her children, and afterwards divided the cattle among her children, which they received as coming to them from their father's estate ; and they have put their marks and brands on the cattle. Witness has frequently heard Mrs. Carrie say, that the sale was a good one, as she had received the advice of her attorney, Mr. Hale." The court excluded each portion of this evidence, on separate motions by the plaintiff; and the defendant reserved exceptions to its several rulings.

The plaintiff also read in evidence, from Hutchinson's Mississippi Code, the statute of that State forbidding administrators to sell property belonging to their intestates' estates without an order of court, or to take it at its appraised value ; and the defendant read, from the same book, the several statutes of limitations. The former of these statutes may be found in Hutchinson's Mississippi Code, page 669, § 109; p. 672, § 117; p. 662, § 85, and p. 661, § 78. The statutes of limitations may be found on the following pages; p. 825, §§ 4, 7; p. 830, § 4; p. 832, §§ 17, 18.

The court charged the jury as follows: "That if the jury should be satisfied from the evidence that the slave Fanny was the property of Henry Carrie, and in his possession, at the time of his death ; that he died in Hancock county, Mississippi; that Mrs. Amelia Carrie obtained letters of administration on his estate in the probate court of said county, took possession of said slave under her grant of letters, and afterwards sold her, at private sale, to James McArthur, the defendant's father,—then such sale was void, and passed no title to said McArthur, but the title remained in the estate of said Henry Carrie; and if the jury should further find from the evidence that there was no final settlement of said estate by said administratrix, and no discharge of her as such administratrix by said probate court, and no appointment of an administrator *de bonis non* of said estate, until the appointment of

plaintiff by the probate court of Tallapoosa county in this State; and that defendant brought said slaves to Tallapoosa county in 1853, before letters of administration were granted by said probate court to plaintiff; and that said slaves, at the commencement of this suit, were in the jail of Tallapoosa county, under the circumstances stated by the sheriff,—then the statutes of Mississippi which had been read in evidence furnished no sufficient bar to plaintiff's right of recovery, and they must find for the plaintiff, even though they should believe from the evidence that defendant and his father, under whom he claimed, had held possession of said slave in Hancock county, Mississippi, for twenty years continuously, claiming them openly as their own property."

The defendant excepted to each part of this charge, and now assigns it as error, together with all the other rulings of the court above stated.

PARSONS & J. WHITE, for appellant.—1. The court erred in refusing a struck jury to the defendant. The language of the statute (Code, § 2264) is positive. The defendant asserted his right at the first moment it was proper for him to do so. The court might have required both parties, before entering on the trial, to say whether they demanded a struck jury; and their failure then to demand it would have forfeited the right. But the court, instead of doing this, called on each party in turn to say whether he was satisfied with jury No. 2; and the defendant, in response to the inquiry, demanded his statutory right.

2. The defendant had not, at the commencement of the suit, such possession as made him liable in detinue. The property had been taken from him under legal process, and was neither actually nor potentially in his possession. Walker v. Fenner, 20 Ala. 199; Cole v Connelly, 16 Ala. 281; Governor v. Gibson, 14 Ala. 326; Union Bank v. Benham, 23 Ala. 143; 1 Brevard, 301; 3 Leigh, 694.

3. The sheriff should not have been permitted to amend his return on the first writ, because rights had in the meantime attached under it.—Watkins v. Gayle, 4 Ala. 153; McGehee v. McGehee, 8 Ala. 86; Barton v. Lock-

hart, 2 S. & P. 109; 2 H. & M. 180; 5 Howard, 173; 13 Mass 270; Smede's Digest, 385, § 23; 7 Ala. 715; 5 S. & P. 118. The same authorities show that the court erred in allowing the amended return to be read in evidence.

4. The declarations of Mrs. Carrie, as proved by the witness Daniels, were mere hearsay. She was not then in possession of the slaves, nor was the defendant present. Moreover, she was estopped from denying the validity of her own sale.—Pistole v. Street, 5 Porter, 64; Fambro v. Gantt, 12 Ala. 298; Hopper v. Steele, 18 Ala. 828; Lay v. Lawson, 24 Ala. 184; Wyatt's Adm'r v. Rambo, 29 Ala. 510. Nor could she, by her subsequent declarations, affect the title of one claiming under a purchase from her.—Gillespie's Adm'r v. Burleson, 28 Ala. 526.

5. The evidence offered by the defendant, to show that Mrs. Carrie paid the debts of the estate with a portion of the money arising from the sale of these slaves, and purchased cattle and other property with the residue, which she afterwards divided among her children, and which "they received as a portion of their father's estate," was unquestionably relevant, as tending to show an election by the parties in interest to treat the sale as an administration.—Elliott v. Branch Bank at Mobile, 20 Ala. 345, and cases there cited.

6. The validity of the defendant's title depends on the laws of Mississippi: if his title was good when he left that State, in March, 1853, he has not lost it by coming here. The charge of the court erroneously assumes, that the Mississippi statute read in evidence, forbidding private sales by administrators, was enacted before the sale in question was made. The bill of exceptions purports to set out all the evidence, but does not show when that statute was passed; and by the common law, which must be presumed to prevail in the absence of proof to the contrary, an administrator might make a private sale. But, if that statute applies to the case, it only authorizes the distributees to avoid such sale, and does not render it absolutely void.—Hopper v. Steele, 18 Ala. 834; Baines v. McGehee, 1 Sm. & Mar. 208; Murphy v. Clark, 1 ib.

221; Morton v. Howard, 2 *ib.* 527; Miller v. Helm, 2 *ib.* 687.

7. The charge erroneously assumes, also, that the statutes of Mississippi authorized an action for the recovery of these slaves after more than twenty years open adverse possession of them in that State. This is at variance with well-settled legal presumptions, as recognized by several decisions of this court.—Rhodes v. Turner and Wife, 21 Ala. 217; Barnett v. Tarrence, 23 Ala. 466; Gantt's Adm'r v. Phillips, 23 Ala. 189, and cases there cited; see, also, Bird v. Graham, 1 Iredell's Eq. R. 196.

Wm. P. & T. G. Chilton, with Jas. E. Belser, *contra.*

1. The call for a struck jury came too late, and was, therefore, properly refused.

2. The motion to suppress the deposition of Daniels came too late, and was correctly overruled.—Code, § 2328.

3. The amendment of the sheriff's return was authorized by the facts to which that officer deposed, and was allowable under several decisions of this court.—Brandon v. Snow, 2 Stew. 255; Woodward v. Harbin, 4 Ala. 534.

4. The defendant's possession was sufficient to authorize the suit against him.—Walker v. Fenner, 20 Ala. 198; Fenner v. Kirkman, 26 Ala. 653. The sheriff, while he holds possession of property under legal process, is the agent of both parties, and holds as bailee for him who may be held entitled to it. On the plaintiff's order to the sheriff to discharge the seizure under the first writ, the latter became a mere bailee for the defendant; and the property was, in legal contemplation, in the defendant's possession.

5. Under the Mississippi statute read in evidence, which is substantially like our own, a private sale by an administrator is void.—Hutchinson's Miss. Code, 669, § 109; Clay's Digest, 223, § 13; Baines v. McGehee, 1 Sm. & Mar. 208; Wharton v. Howard, 2 Sm. & Mar. 527; Gelstrop v. Moore, 26 Miss. 206; Currie v. Stewart, 27 Miss. 52; Ventress v. Smith, 10 Peters, 161; Fambro v. Gantt, 12 Ala. 298; Hopper v. Steele, 18 Ala. 828; Wier v.

Davis & Humphries, 4 Ala. 442; Dearman v. Dearman, 4 Ala. 521; Lay v. Lawson, 24 Ala. 184.

6. The sale of the slaves by Mrs. Carrie, if private, being void, the statute of limitations does not bar a recovery by this plaintiff. Although the sale was void as to the distributees, it was valid as to the administratrix by whom it was made, and she was estopped from suing for the property. Therefore, there was no one capable of suing until the appointment of the administrator *de bonis non*, and the statute of limitations did not begin to run until his appointment.—Hopper v. Steele, 18 Ala. 828; Swink's Adm'r v. Snodgrass, 17 Ala. 653; Lay v. Lawson, 24 Ala. 184; 2 Sm. & Mar. 527; 4 Cushm. 206.

7. No legal presumption of acquiescence can be drawn from mere lapse of time, when there is no person capable of suing.—7 Har. & John. 24; 5 Barn. & Ad. 66; 2 Vernon, 695; 3 Bac. Abr. 515; 1 Burr. 434; 1 Esp. 254; 2 Cranch, 180; 10 Johns. 147; 1 Bay, 483; 1 Wash. 18; 1 Phil. Ev. 119; 4 Cranch, 415. Presumptions, drawn from mere lapse of time, may be rebutted by slight circumstances.—23 Penn. State Rep. 421; 9 Gill, 361; 4 Rich. L. 203; 2 Jones, (L. R.) 155. Such presumptions do not obtain in favor of one who gets the property of an estate illegally.—6 J. J. Mar. 21; 5 Maryland R. 237.

STONE, J.—1. The Code (§ 2264) does not require the court to be active in assigning a struck jury, in the cases for which that mode of trial is provided. . It is only when one of the parties makes the necessary *demand*, that the court is called upon to order the selection of a jury according to the provisions of the section we are considering. It follows from this, that immediately after the parties have announced themselves ready for trial, and before any steps have been taken therein, the party desiring a struck jury must make the demand; and if he delay until the organization of the jury has been entered upon, the court is not bound to grant his request. Whether it would be error, if the court should make such order after the proper time for making the demand had been permitted to elapse, we need not now inquire.

2. The motion to suppress the deposition of the witness Daniels, came too late. The court did right in overruling it.—Code, § 2328.

3. There was no error in permitting the sheriff to amend his return, so as to make it speak the truth. No *rights*, as the law recognizes that term, had vested in the defendant, which were disturbed by the amendment. Hodges v. Laird, 10 Ala. 678; Caskey v. Haviland, 13 Ala. 314; Kemp & Buckey v. Porter, 6 Ala. 172; Watkins v. Gayle, 4 Ala. 153; Thatcher v. Miller, 13 Mass. 269; McGehee v. McGehee, 8 Ala. 86; Woodward v. Harbin, 4 Ala. 534.

4. Having shown that there was no error in allowing the amendment of the sheriff's return, such amended return, under all our authorities, dates as of the time when it should have been made.—See Hodges v. Laird, *supra;* Woodward v. Harbin, *supra*. There was no error in admitting the amended return in evidence.

5. There was no error in excluding the evidence, that with the proceeds of the slave, Mrs. Carrie " raised and educated her children—that is, by means of the stock of cattle," bought with that money. To allow this defense, would be to legalize the void sale, by the use to which she applied the proceeds.

6. Neither was it permissible to prove that Mrs. Carrie had expressed the belief that " the sale was a good one," or that " she knew the sale was a good one, because she had received the advice of her attorney, Mr. Hall." The validity of the sale depended on the facts attending it, not on her opinion.

7. That portion of the evidence of the witness Roan, which states that " she (Amelia Carrie) afterwards divided the cattle " (bought with the proceeds of the slave) " among her children, which they received as coming to them from their father's estate," presents a question of more difficulty. Evidently, the testimony, as offered, was wholly insufficient as a defense to this action. Their receipt of the cattle, which, it is alleged, were bought with the money received for the slave, could not operate as a ratification of the sale of said slave, unless they, the

children, at the time they received the cattle, were of lawful age, and *knew* with what funds the cattle had been bought. Whether this defense will avail, if they had such knowledge, we do not now determine.—See Story on Agency, §§ 244–253; Butler & Alford v. O'Brien, 5 Ala. 316; Elliott v. Br. Bank of Mobile, 20 Ala. 345.

8. That portion of the evidence of the witness Daniels, which assumed to repeat a declaration made by Mrs. Carrie, to the effect that the slave Fanny had been sold at private sale, should have been excluded. She is not a party to this suit; was not in possession of the property when she made the declaration; and it was not made in connection with any act which it could explain. We suppose this decision was made on the authority of Gantt v. Phillips, 23 Ala. 295. In that case, the declarations were proved against the administrator *de bonis non*, to defeat the claim he set up. They consisted chiefly of statements made by the executrix, Mrs. Gantt, while she had control of the estate. In this case, the declarations are offered by the administrator *de bonis non*, to defeat the title executed by the administratrix in chief, and to show continuing property in the estate. The difference consists in the well-defined distinction between proving admissions against and for the party making them.

The charge of the court presents the only remaining questions which we propose to consider. The charge must be construed in connection with the evidence, all of which is set out in the bill of exceptions. The plaintiff read in evidence a statute of Mississippi, prohibiting private sales by executors and administrators, and which agrees in substance with our own. The proof is in conflict, whether the sale of the slave Fanny by Mrs. Carrie was public or private; but the jury, we suppose, found it was private. The proof conduces to show that the sale and change of possession took place more than twenty years before the present suit was brought. The proof also shows that, when this suit was instituted, the slaves in controversy were in the jail of Tallapoosa county, having been lodged there by the sheriff under a former seizure, in a suit by Mrs. Carrie against the defendant in this suit.

The proof shows that, before the seizure in this case, the sheriff was instructed by the plaintiff's attorney—the same attorney having instituted both suits—to discharge the levy made under Mrs. Carrie's writ. The amended return shows that, in legal effect, this was then done.

9. The circuit court did not err in construing the Mississippi statute in relation to private sales by administrators. In that State, as in this, such sales are void.

10. It is here contended, that, at the time this suit was commenced, the defendant had not such possession of the slaves as would justify the maintenance of this action.

In the case of Walker v. Fenner, 20 Ala. 192, 198, which was an action of detinue, this court said, that, after carefully looking into the authorities, it might "be safely asserted, as the rule deducible from them, that to entitle the plaintiffs to recover, they must show that the defendant, either at the time of demand made, or, in the event there was no demand, at the time the writ was sued out, had the actual possession, or the controlling power over the property; unless, having the possession anterior to such demand or suit, he has wrongfully, or to elude the plaintiff's action, parted with it; or unless he holds it under a contract of bailment, the terms of which he violates by failing to re-deliver it." To the same effect are Fenner v. Kirkman, 26 Ala. 650–5; Harris v. Hillman, ib. 380.

At the time this suit was commenced, the defendant had not the actual possession of the property, neither had he, so far as this testimony informs us, parted with the possession by any act or volition of his own. He had been dispossessed by legal process. So long as the property was held under that process, the sheriff had a special property in it, and the defendant did not have the "controlling power" over it. The primary court in this case instructed the jury, in effect, that if they believed the testimony of the witness Lockett, as to the custody of the slaves when this suit was brought, then the defendant had such possession as would justify this action. In this the circuit court passed on the *sufficiency* of the evidence, leav-

ing its credibility to be passed on by the jury. Was this correct under the facts of this case?

We think it clear that, if the sheriff, under instructions from plaintiff, or her attorney, discharged the first levy before the second writ was sued out, this placed the slaves under the legal control of the defendant, and, on this point, justified the institution of the second suit. After such discharge of the levy, the sheriff's possession ceased to be in his official character, and he held the slaves as the naked bailee of the defendant. In other words, his possession was that of defendant, and became wrongful when he failed to deliver the slaves on demand. The defendant had the immediate right of possession. See Walker v. Fenner, *supra*.

Let us apply these principles to the question we are considering. The testimony of Lockett, the only witness who speaks to this point, fails to show that the instructions to discharge the first levy preceded the suing out of the second writ. In the brief statement of these facts, the idea is rather conveyed, that at one and the same time, the direction was given to discharge the first levy, and to make the second. If this be so, it is somewhat repugnant to the idea that the instructions to discharge were given before the second writ was issued. In this state of the proof, the court should have left it to the jury to say whether the one or the other preceded. If the second writ was issued before the order was given to discharge the levy, then the defendant had not, " at the time the writ was sued out," such *controlling power* over the slaves as would sustain this branch of the action.

11. Another portion of the charge instructed the jury to find for the plaintiff, if they found certain hypotheticated facts to be true, " even should they believe from the evidence that defendant and his father, under whom he claimed, held possession of the slave Fanny in Hancock county, Mississippi, for twenty years, claiming them openly as their own property."

In this, as in most of the States of this Union, there is a growing disposition to fix a period, beyond which human transactions shall not be open to judicial investiga-

tion, even in cases for which no statutory limitation has been provided. This period is sometimes longer, and sometimes shorter, dependent on the nature of the property, and the character of the transaction. By common consent, twenty years have been agreed on, as a time at the end of which many of the most solemn transactions will be presumed to be settled and closed. See 2 Story's Equity, § 1028 b. The nature of this presumption, and the manner of drawing it, are not in the mother country, and in the several States, the same. See, on this subject, Cowen & Hill's Notes to Phil. Ev. (edition by Van Cott,) Part I, pp. 536, 456, 457, 464, 485 to 500, 504–505; Vol. 5, same edition, 267 ; Sims v. Aughtery, 4 Strob. Eq. 103.

The precise question we are considering does not appear to have been before considered in this court. Kindred questions have been under review. In Rhodes v. Turner and Wife, 21 Ala. 210, an effort was made to bring an administrator to a settlement after a great lapse of time. Chilton, J., employed the following very pointed language : "If a final judgment had been rendered, according to the principles of the common law it would be presumed to have been paid after the expiration of twenty years ; and if the parties allow this period to elapse without taking any steps to compel a settlement, we think the presumption of payment arises, and the executor or administrator should be exempted from the necessity of hunting up evidence to prove accounts and vouchers which ordinarily enter into such settlements."

In Barnett v. Tarrence, 23 Ala. 463, a settlement had been attempted; but it was so defective, that, under our decisions, it could not be regarded as a final settlement. More than twenty years afterwards the administrator was cited to a final settlement, and he was sought to be charged with assets for which he had never accounted. This court, after deciding that it would presume, after so great a lapse of time, in favor of the correctness of that settlement, that the necessary notices were given, and that the parties in interest were present, proceeded to remark, that "a decree, rendered under such circumstances, is binding on the parties to it until it is reversed in the proper court. * * *

The executors cannot now be called upon, in the probate court, to go into a settlement again, when all parties have reposed on that already made, for so long a period that it is fair to presume that much of the proof which was then obtainable could not now be commanded." In further considering this presumption, the court added, "We have carefully examined the ground on which the rule here suggested is founded, and are thoroughly convinced its adoption is essential to the safety and repose of executors, administrators and guardians, and to the advancement of the ends of common justice. It is strictly analogous to the rule at common law in relation to judgments, and more liberal than the rule in equity with respect to stale claims."

The case of Gantt's Adm'r v. Phillips, 23 Ala. 275, was a suit by an administrator *de bonis non*, to recover a slave, the title to which, it was alleged, had never passed out of the estate. The defendant, and those under whom he claimed, had been in the adverse possession of the property for more than twenty years. The record of the orphans' court did not show that the person named as executrix of the will had ever qualified. If she had not qualified, then there could have been no assent to the legacy—the slave was still a part of the estate of the testator, and the plaintiff was entitled to recover. The circuit court charged the jury, that the record of her appointment as executrix would be the highest and best evidence of the fact; but, if the proof showed to their satisfaction that the appointment and qualification of said Elizabeth Gantt as executrix had been duly made, and that in the lapse of time the papers and records of the appointment had been lost or destroyed, then the jury might presume her appointment and qualification. The latter part of this charge was assigned as error. This court, after collating and commenting on many decisions of other courts, said, "under the circumstances, we consider the court left the question to the jury quite as favorably as the plaintiff was authorized to demand." The judgment was affirmed.

In Harvey v. Thorpe, 28 Ala. 250, a similar decision was made.—Lay v. Lawson, 23 Ala. 377.

It will be observed, that in the case cited from our own reports of Barnett v. Tarrence, the presumption drawn by the court in favor of the regularity and validity of the decree was conclusive, not a mere *prima-facie* intendment, liable to be overturned by proof. To the same effect is the principle announced in Rhodes v. Turner and Wife, *supra.* These were proceedings against administrators, for wasting, misapplying, and not accounting for assets of the estates they represented. Under the authority of those cases, if an administrator has converted to his own use, or privately sold, the property of the estate, and has not been proceeded against for the conversion until the expiration of twenty years after the time when he should have settled the estate, he is forever discharged, on a mere presumption of law. Suppose after that time an administrator *de bonis non* should be appointed, and should sue the purchaser for property which the administrator in chief had sold to him privately, or without an order. The law would presume, in favor of the faithless administrator in chief, that he had accounted and settled for the property, although the record might show nothing on the subject. If the purchaser, under these circumstances, should be held accountable for this identical property, would not the law present a strange anomaly? Applying these principles to the case at bar, Mrs. Carrie, in 1853, when this suit was brought, could not, under our decisions, be made to account for the conversion or *devastavit* of these slaves. Can McArthur be made to account for them?

In the cases of Gantt v. Phillips, and Harvey v. Thorpe, the question, whether the presumption was conclusive or not, was not presented by the record, and was not discussed. We do not regard them as authorities against the principles announced in Rhodes v. Turner and Wife, and Barnett v. Tarrence, *supra.*

There is an able discussion of this question in the case of Sims v. Aughtery, 4 Strob. Eq. 103. That case, in its legal bearings, was strikingly like the present. The cir-

cuit decree was pronounced by Chancellor Dunkin, who, quoting from a former decision, used the language that, "the lapse of twenty years is sufficient to raise the presumption of almost anything that is necessary to quiet the title of property. If there had been no will and no administration, administration would nevertheless be presumed, and that defendants had acquired a title from the administrator. * * * After a possession of twenty-five years, the court will presume a sale by the executor for the purpose of paying the debts, an administration de bonis non after Lyle's death, and a sale by such administrator, or almost anything else, in order to quiet the long possession."

In the court of appeals, the opinion was delivered by Chancellor Dargan. The profession is referred to it as an elaborate vindication of this doctrine. After copying the language of Chancellor Dunkin last above quoted, he adds, "This is strong language, but not stronger than is warranted by the authorities, or demanded by a stern and imperative public policy. In regard to property not the product of manual labor, there is, perhaps, no title extant in any part of the world, that could withstand the searching scrutiny of justice, and which, if traced to its origin, would not be found to be based upon fraud, rapine, spoliation, or conquest."

After adverting to the statutes of limitation as one means of giving repose to stale subjects of litigation, he proceeds to remark, "We have another system of rules, founded upon what is called the doctrine of legal presumptions, which prevail alike in courts of law and equity, and which are eminently subservient to the quieting of titles, and the prevention of litigation arising upon obscure and antiquated transactions. If these legal presumptions require a longer period than statutory bars to acquire force and effect, they are more general in their operation. They are highly conducive to the peace of society and the happiness of families; and relieve courts from the necessity of adjudicating rights so obscured by time and the accidents of life, that the attainment of truth and justice is next to impossible. * * * * * These

McArthur v. Carrie's Adm'r.

legal presumptions, by which conflicting claims and titles are set at rest, I have endeavored to show are natural and necessary. They spring spontaneously out of the institution and relations of property. As to the precise time at which they arise, each independent community must judge for itself. We have adopted the law of the mother country. In South Carolina, as in England, by the lapse of twenty years without admissions, specialties and judgments are presumed to be satisfied, and trusts discharged. Twenty years continued possession will raise the presumption of a grant from the State, of deeds, wills, administrations, sales, partitions, decrees, and (the chancellor has said) of almost anything that may be necessary to the quieting a title, which no one has disturbed during all that period." See, also, the case of Williamson v. Williamson, 1 Johns. Ch. 488, 492-3.

In examining the numerous authorities on this question, to be found in the reported cases of trials at law, the profession will frequently encounter the declaration, that from this lapse of time the jury are *authorized* to draw the presumption which we have been considering. By this we understand, that the question is at all times one for the jury; a presumption they *may* draw, but that there are no rules which govern them in such cases. Such was the instruction of the circuit court in the case of Gantt v. Phillips, and in the case of Harvey v. Thorpe, *supra.* Now, with all due deference, we confess ourselves unable to perceive any solid reason on which to rest such a principle. We think it is at war with the analogies of the law, and with the theory of jury trials. Juries are organized to pronounce on the credibility of witnesses; to determine disputed facts; to draw conclusions from doubtful and contradictory premises; and to admeasure damages where the law has afforded no standard. We do not say these are the only functions of a jury, but they are the controlling ones. Whenever the facts of a case are clear and uncontroverted, the rights of parties are, or should be, fixed and uniform. When there remains no fact to be found, or conclusion to be drawn from contested and indeterminate premises, there is no use for a jury, for the

law determines the rights of the parties. This principle is absolutely necessary, as the basis of a uniform system of jurisprudence. So, in cases where a jury trial is necessary, every proposition which stands forth clear and undisputed, and which rests on no inference to be drawn from disputable or controverted premises, is, or ought to be, a question of law. On this principle rest all our presumptions of law.

It is not our purpose to deny to the jury the right and duty of determining whether in fact the twenty years have elapsed. That fact being found, however, and there being no countervailing proof, what reason can exist for leaving it to the discretion, possibly caprice, of that body, whether they will draw the desired conclusion? There is one naked fact, to-wit, acquiescence for twenty years. There can be no reason for indulging the presumption in one case which does not exist in all others. Chancellors invariably draw the presumption from this one fact, and we think a rule equally uniform should prevail in courts of law. To lay down a different rule, will be to invite a contest and jury trial in every case thus circumstanced. The circumstances of each case will be appealed to by opposing counsel, in the hope that they severally may impress the jury with the belief that it is their duty in the particular case to indulge or withhold the presumption, as the one or the other result will promote their several interests. We are unwilling to declare a rule, the result of which may be to tempt juries from their propriety, to multiply litigation, and to increase the uncertainty which must always attend the administration of the law.

We do not wish to be understood as saying that this presumption is always conclusive. In the first instance, perhaps it never is so. In cases like the present, however, we hold that a *prima-facie* presumption is raised, whenever there is satisfactory proof of twenty years uninterrupted, adverse enjoyment and possession.

Speaking of this presumption, Mr. Starkie says, (edition of 1826, vol. 3, p. 1214,) "It gives to the evidence a technical efficacy beyond its simple force and operation." On page 1224, he says, this is not a direct and immediate

inference to be made by the courts [of law]; yet "the court will, under certain circumstances, direct a jury to presume an outstanding term to have been surrendered by the trustee." To the same effect is Vandick v. Van Buren, 1 Caines' Rep. 34. See, on this subject, Cow. & Hill's Notes to Phil. Ev. (ed. by Van Cott,) Part I, pp. 485, *et seq.*; 2 Wend. Black. 266, note 10; Beck on Presumptions, 144; Smithpeter v. Ison, 4 Rich. Law, 203; 3 Bouv. Bacon, 621; Jackson v. McCall, 10 Johns. 377; 1 Greenlf. Ev. § 46; Warren v. Webb, 2 Strange, 1129; Rex v. Carpenter, 2 Show. 47; Trotter v. Harris, 2 Younge & Jervis, 285; Beall v. Lynn, 6 Har. & Johns. 336, 353, 361; Ld. Pelham v. Pickingill, 1 T. R. 381; Doe v. Ireland, 11 East, 280, 284; Goodtitle v. Baldwin, *ib.* 288; Penwarden v. Ching, 1 Moody & Mal. 400; Rex v. Long Buckley, 7 East, 45; Mayor of Kingston v. Horner, Cowper, 102, 110; Stodder v. Powell, 1 Stew. 287; 1 Greenl. Cruise, 415, 416; Bustard v. Gates, 4 Dana, 430; McPherson v. Cunliff, 11 Serg. & R. 422, 432.

This *prima-facie* case may, of course, be overturned. It cannot be done by proving that the title was, in its inception, defective. Proof, to be effectual for this purpose, must be addressed to the *character* of the plaintiff's possession, either in its *acquisition* or *use;* must tend to show that such possession is not inconsistent with the plaintiff's right; or some other excuse, independent of original defect of title, must be given for the seeming long acquiescence. We cannot now be more definite.

The record before us contains no excuse for the delay; and in such case, the *prima-facie* presumption becomes conclusive. It results from this, that the charge of the circuit court was erroneous.

We confine this rule, for the present, to property situated substantially as this is, and do not design to pronounce upon the effect of all possessions that are acquiesced in for twenty years.

We think the facts of this case are eminently illustrative of the propriety of indulging the presumption that these proceedings were regular. The sale took place twenty-two or twenty-three years before this suit was in-

stituted. During all that time, save perhaps a few months, the property remained in the neighborhood in which it was sold, in the independent and undisputed possession of the elder and younger McArthur. The court-house, and all the records pertaining to Mrs. Carrie's administration, have been destroyed by fire; and the few living witnesses who are left to testify of this transaction, give versions of it that are wholly different and irreconcilable. One class swears, that the sale was private, for they conducted the negotiation; another, that it was public, for they witnessed it. The various persons who have held office in the probate court in which these proceedings were, or should have been of record, differ as radically and essentially in their recollection of what those records did disclose. This discrepancy and conflict should not induce us to pronounce a severe judgment on the motives of the witnesses. All who have lived long enough, and who, after the lapse of a quarter of a century, have attempted to call up from "memory's waste" the details of any transaction of only ordinary interest, will deal charitably with such discrepancies.

This transaction originated in the State of Mississippi. The possession by the defendant and his father, under whom he claims, has been mainly held in that State. Whether or not a different rule prevails there,—and, if different, whether that rule will be enforced by our courts, are questions not presented by this record, and we do not now decide them. See Stevenson's Heirs v. McRreary, 12 Sm. & Mar. 9, 44; Walker v. Forbes, at the last term of this court.

Judgment of the circuit court reversed, and cause remanded.

RICE, C. J., not sitting.