139 So. 233

**BRANTLEY et al. v. HELTON.**

4 Div. 590.

Supreme Court of Alabama.

Jan. 14, 1932.

Wilkerson & Brannen, of Troy, for appellants.

A. G. Seay, of Troy, for appellee.

## BOULDIN, J.

The action is statutory ejectment to recover a triangular strip of land 150 feet in length, 5½ feet in width at the north end, and narrowing to a point at the south end.

The parties are owners of adjoining city lots. Each claims the strip in question.

Appellants, defendants below, raise the point that the plaintiff failed to prove title, in that no chain of title back to a common source, nor evidence of prior possession in plaintiff, nor those under whom she claims was introduced. No statutory issue to settle a disputed boundary line being presented, and plaintiff's right of recovery depending on the strength of her own title to this strip, this position would seem to be correct.

But the cause was tried and evidence fully developed with a view to settling the true line between the residence lots of Mrs. Helton on the east and Mrs. Brantley on the west, and we proceed to consider the case to that end.

In 1880, O. C. Wiley, father of Mrs. Brantley, purchased and obtained a deed to west half of lot 9, according to the Goldthwaite survey of the lands of the estate of James S. Murphree, deceased, in the city of Troy.

Lot 9, according to this survey, fronted south on College street 294 feet, and ran back north a uniform width to the quarter section line. Murphree street was later laid out across the north end, and still later surveys show the depth of the lot from College street to Murphree street to be 407 feet.

From the time of his purchase in 1880, Mr. Wiley occupied his lot as residence property. He, as early as 1880, or his predecessors had theretofore built a fence on the east side of his property, extending the entire length of the lot. The back or north end of his lot was inclosed and used as a garden.

This fence was maintained, and actual possession held thereto for more than thirty years during the lifetime of Mr. Wiley. Mrs. Wiley, his widow, testifies that he always claimed title to this as the line fence.

Turning to the adjoining lot on the east, known as the Wood's lot, the first link in plaintiff's chain of title, dating back to 1894, describes the same as bounded on the west by "lot of O. C. Wiley." We note this early conveyance from A. A. Park to Mellona L. Wood calls for no plat, gives no dimensions, but bounds the lot by naming the adjoining streets and landowners.

It appearing without dispute that the Wiley lot was then inclosed, the natural import of such deed was to convey to the Wiley lot as then defined by possession and the dividing fence. The same description appears in the conveyances to F. S. Wood in 1911.

Plaintiff's deed calls merely for the northwest corner of the F. S. Wood lot, which, by reference to the F. S. Wood deed, means the northeast corner of the Wiley lot.

After the opening of Murphree street north of lot 9, Mr. Wiley, in 1913, desiring to deed to each of his two daughters a residence lot fronting on Murphree street, caused a plat to be made of his property, retaining for his residence the full width on College street and running back 257 feet, and dividing the residue, 150 feet in depth, into two lots. This plat shows 147 feet front on Murphree street, being one-half the width of lot 9 as per original Goldthwaite plat, and deeds were made by Mr. and Mrs. Wiley to each of their two daughters, according to this plat, calling for 73½ feet each in width. The plat was duly recorded.

In 1917, Mrs. Brantley built a residence on her lot, rented it for one year, and has occupied same ever since. There is evidence that at the time such residence was built Mr. Wiley pointed out the line fence, still standing, as the eastern boundary of Mrs. Brantley's lot; that the residence and driveway were located with reference thereto; that Mrs. Brantley within the year set myrtles, which are still standing just on her side of the fence; and that she has held possession, claiming to such line as her boundary, for more than ten years prior and down to the bringing of this suit.

There is further evidence, not disputed, that Mr. Wood, during the lifetime of Mr. Wiley, joined in maintaining the fence between the two properties; and further evidence that he inclosed his adjoining lot, fronting on Murphree street; and, after Mrs. Brantley acquired her lot, Mr. Wood rebuilt the fence on the same line as a part of the inclosure of his lot. This fence remained until Mrs. Helton, the plaintiff, acquired her lot from the administrators of F. S. Wood, deceased, in 1923.

Mrs. Helton then built on her lot. A portion of this old fence at the front was then removed. As to this, without going into details, it is clear from Mrs. Helton's testimony that this was not due to any question as to the boundary line between the lots, but for convenience, and by permission of Mrs. Brantley. Indeed, Mrs. Helton shows she never questioned the location of the boundary until 1929, when it was ascertained the measurement of the lot still east of her was short, and a survey was made placing her corner 5½ feet west of the location of the fence. This gave rise to a controversy for the first time. Thereupon, Mr. Brantley re-extended the fence back to the street, and this lawsuit followed.

We note, of course, some testimony for plaintiff to the effect that the present fence is, at the front, not precisely on the line of the old fence. No effort is made to show how much it is off line. The whole evidence clearly shows it was intended to be and is substantially on the old line, identified by shade trees, a chinaberry stump, myrtles, and the dividing line of the driveway into the respective properties. Indeed the surveyor, making the survey of 1929, testifies the old fence then standing between the two lots at the rear, extended to the street, would place the corner 5½ feet east of the corner set up by him, the same distance from the present fence.

■ Taking this last survey as entirely correct in locating the division line as per the original layout and plat, the inquiry is: Does the evidence as a whole establish the true line on the ancient boundary marked by the fence under the law of adverse possession, or the doctrine of prescription?

Adverse possession as between adjoining landowners, where a question of boundary line is presented, has been many times declared

by this court. When the parties agree upon the location of a line fence, or one of them proceeds to inclose his property, and erects a fence intended as a line fence, holds actual and exclusive possession to it as such, his possession is adverse, and, if continued for ten years, ripens into title.

If the location of the fence is merely tentative, not intended to define a permanent boundary, and possession is taken, not under claim of title to the fence, but merely to the true line, to be thereafter ascertained, such possession is not adverse.

The controlling fact is one of intention. The mere fact that a mistake was made in locating the boundary, and there was never an intention to claim the property of another, does not negative adverse possession. Such a rule would make adverse possession to depend upon bad faith.

Was there an intention to fix a dividing line, each to have the enjoyment of his own property, and was possession taken and held accordingly, each claiming the property held as his own, because he considered it his own? If so, the possession is adverse. Of course, adverse possession may arise from boldly and knowingly taking the property of another, or taking it regardless of whether he believes it is his, thus ousting the true owner, and holding in hostility to him.

But in law a hostile possession is not limited to any such case. It is hostile when held as his own, claimed as his own, whether by mistake or willfully.

There are certain cases of entry under the owner, or in recognition of joint ownership, and the like, when notice of a hostile possession must be brought home to the owner; but in boundary line cases, the inclosure of valuable lands, such as city lots, and appropriation of same to a beneficial enjoyment, carries notice of an adverse claim to the adjoining owner, or puts him on inquiry.

In this case, the possession goes back a half century from the time of the trial.

The rule of repose, so essential to the security of titles at law and in equity, is intended to put an end to demands permitted to slumber until, by the long lapse of time, and the death of parties whose transactions are brought into question, the whole truth cannot be known. Whether long inaction be from want of diligence in ascertaining or in asserting rights, such rule has a just field of operation in boundary line cases.

In a case like this, where beneficial enjoyment of inclosed lands had continued for more than thirty years during the lifetime of Mr. Wiley, a strong presumption must be indulged in favor of the line marked by the division fence.

An agreed line, by express agreement of adjoining owners, or by act of one with the acquiescence of the other, will be presumed, and can be overturned only by strong evidence to the contrary.

The evidence relied upon to overcome such presumption consists of the documentary evidence, the plat made by the surveyor for him in 1913, the conveyances made in accordance therewith, in connection with the evidence touching such survey.

The surveyor's testimony does not show whether a corner was set up at the northeast corner of the survey, nor its relation to the dividing fence. It appears he started in to make a survey of Mr. Wiley's lot as inclosed. But the measurements and plat followed the deeds and original plat.

Certain it is no change was made in the location of the boundary line fence after the survey of 1913, and, as stated, there is unquestioned evidence of acquiescence in this ancient boundary thereafter on the part of Mr. Wood, the adjoining proprietor.

Indeed, plaintiff by her own complaint, locates her southwest corner on this ancient fence line, thus recognizing the fence as the boundary at a point 257 feet back from College street, and seeks to change direction to the extent of 5½ feet in 150 feet.

Under no phase of the evidence could it be found that Mr. Wiley held adversely to the fence a portion of the way and not on through to Murphree street.

If title to the fence row was vested in Mr. Wiley by prescription prior to 1913, nothing short of a grant or adverse possession by plaintiff and her predecessors could give her title to the parcel now claimed.

In the light of events both before and after the survey of 1913, what was then done cannot overcome the strong evidence of defendants' prescriptive right. Moreover, the evidence makes a case of adverse possession on the part of Mrs. Brantley for more than ten years after she took actual possession and built upon her lot.

We cite the following authorities in support of the governing principles above stated and applied: Shepherd v. Scott's Chapel, A. M. E. Zion Church, 216 Ala. 193, 112 So. 905; Hoffman v. White, 90 Ala. 354, 7 So. 816; Copeland v. Warren, 214 Ala. 150, 107 So. 94; Hopkins v. Duggar, 204 Ala. 626, 87 So. 103; Hess v. Rudder, 117 Ala. 525, 23 So. 136, 67 Am. St. Rep. 182; Kidd v. Browne, 200 Ala. 299, 76 So. 65; Alexander v. Wheeler, 69 Ala. 332; McArthur v. Carrie's Adm'r, 32 Ala. 75, 70 Am. Dec. 529; Kidd v. Borum, 181 Ala. 144, 61 So. 100, Ann. Cas. 1915C, 1226; Davis v. Grant, 173 Ala. 4, 55 So. 210; 9 C. J. p. 246, § 199; McNichol v. Flynn, 167 App. Div. 646, 153 N. Y. S. 308.

While the evidence was taken orally before the trial judge sitting as a jury, the controlling facts are not in substantial dispute.

We are convinced the judgment was due to a misapplication of the law of the case.

Let the judgment be reversed and one here rendered for appellants, defendants below.

Reversed and rendered.

ANDERSON, C. J., and FOSTER and KNIGHT, JJ., concur.