196 So. 111

**BARBAREE et al. v. FLOWERS.**

**4 Div. 112.**

Supreme Court of Alabama.

May 9, 1940.

Andrews & Andrews and Moseley & McIlwain, all of Union Springs, for appellants.

Cope & Cope and T. S. Frazer, all of Union Springs, and Steiner, Crum & Weil, of Montgomery, for appellee.

GARDNER, Chief Justice.

Complainant (appellee here) owning a certain lot situated on the north side of Conecuh Street in Union Springs, Alabama, filed this bill against respondents, P. J. Barbaree and Mrs. M. E. Forsyth, whose lots adjoin hers on the east, to settle the boundary line between them, which is in dispute. Sections 6439–6441, Code of 1923. A fence, extending from the southwest corner of the Barbaree lot to the northwest corner of the Forsyth lot, is the present dividing line of the respective parties: complainant insisting that on the north end the fence embraces about 18 feet of her lot, narrowing down to 6 feet at the south end.

The defense rests upon the doctrine of adverse possession and prescription: a defense here available. Branyon v. Kirk, 238 Ala. 321, 191 So. 345. To establish this defense the burden rested upon respondents. Hancock v. Warren, 235 Ala. 180, 177 So. 907. As said in McDaniel v. Sloss-Sheffield Steel & Iron Co., 152 Ala. 414, 44 So. 705, 706, 126 Am. St.Rep. 48: "In order to establish adverse possession, as against the holder of the legal title, 'the law is stringent in requiring clear proof of the requisite facts. There must be, first, an actual occupancy, clear, definite, positive and notorious; second, it must be continued, adverse, and exclusive during the whole period described by the statute; third, it must be with an intention to claim title to the land occupied.'" All of the authorities, of course, emphasize the requirement that the possession must

512

be held under a claim of right. McLester Building Co. v. Upchurch, 180 Ala. 23, 60 So. 173; Smith v. Cook, 220 Ala. 338, 124 So. 898; Dothard v. Denson, 72 Ala. 541; Hornsby v. Tucker, 180 Ala. 418, 61 So. 928.

It is not insisted that section 6069, Code of 1923, or its progenitors have application here. Shepherd v. Scott's Chapel, 216 Ala. 193, 112 So. 905; Branyon v. Kirk, 238 Ala. 321, 191 So. 345; Hancock v. Warren, 235 Ala. 180, 177 So. 907.

As to boundary line disputes the doctrine of adverse possession has been often discussed in our cases, among the more recent being Brantley v. Helton, 224 Ala. 93, 139 So. 283; Branyon v. Kirk, 238 Ala. 321, 191 So. 345; Shepherd v. Scott's Chapel, 216 Ala. 193, 112 So. 905.

Complainant lays much stress upon the matter of intention on the part of respondents to claim this strip as their own. In the Kirk case, supra, after observing that the matter of adverse possession is one of intention, the opinion continues as follows [238 Ala. 321, 191 So. 348]: "If it was so held because he considered it his own, and claimed it as his own, it is hostile though he does not suppose he is claiming more than he owns; and that such claim is ·by a mistake of fact. It is not necessary for one to know that he is claiming the property of another when he is in the actual possession of it to make such possession adverse to the true owner. If he is in the actual possession with the intention to hold it and claim it as his own, it is adverse."

Like observations were made in the Brantley case, supra. There it was pointed out that the mere fact that a mistake was made in locating the boundary, and there was never an intention to claim the property of another, does not negative adverse possession, for possession is hostile when one holds the property as his own, claims it as his own, whether by mistake or wilfully. It was there further observed [224 Ala. 93, 139 So. 285]:

"The controlling fact is one of intention. The mere fact that a mistake was made in locating the boundary, and there was never an intention to claim the property of another, does not negative adverse possession. Such a rule would make adverse possession to depend upon bad faith.

"Was there an intention to fix a dividing line, each to have the enjoyment of his own property, and was possession taken and held accordingly, each claiming the property held as his own, because he considered it his own? If so, the possession is adverse. Of course, adverse possession may arise from boldly and knowingly taking the property of another, or taking it regardless of whether he believes it is his, thus ousting the true owner, and holding in hostility to him.

"But in law a hostile possession is not limited to any such case. It is hostile when held as his own, claimed as his own, whether by mistake or willfully.

"There are certain cases of entry under the owner, or in recognition of joint ownership, and the like, when notice of a hostile possession must be brought home to the owner; but in boundary line cases, the inclosure of valuable lands, such as city lots, and appropriation of same to a beneficial enjoyment, carries notice of an adverse claim to the adjoining owner, or puts him on inquiry.

"In this case, the possession goes back a half century from the time of the trial.

"The rule of repose, so essential to the security of titles at law and in equity, is intended to put an end to demands permitted to slumber until, by the long lapse of time, and the death of parties whose transactions are brought into question, the whole truth cannot be known. Whether long inaction be from want of diligence in ascertaining or in asserting rights, such rule has a just field of operation in boundary line cases.

"In a case like this, where beneficial enjoyment of inclosed lands had continued for more ·than thirty years during the lifetime of Mr. Wiley, a strong presumption must be indulged in favor of the line marked by the division fence.

"An agreed line, by express agreement of adjoining owners, or by act of one with the acquiescence of the other, will be presumed, and can be overturned only by strong evidence to the contrary."

█ In the instant case there is no pretense of any agreed boundary line. Nor is there anything in this record that could be said to question the good faith and bona fide belief on the part of these respondents that the fence was the true line. There is nothing, therefore, in this record to indicate the possession of this strip of land originated in any admitted ·mistake. Shepherd's case, supra.

Giving application to these rules established for the court's guidance in cases of this character, we feel impelled to differ from the ruling of the chancellor in the instant case.

Upon the question as to who originally constructed this dividing line fence the record is silent. Perhaps, from the passage of so great a length of time this fact could not well be established. Mrs. Griffin is the daughter of Mrs. Emma McGowan, who formerly owned the property now owned by these respondents,—the mother having been such owner sixty or seventy years. Mrs. Griffin lived with her mother on the lot now owned by respondent Barbaree, and when so residing they used the lot of Mrs. Forsyth as a garden. Mrs. Griffin and her mother sold to Barbaree his lot in 1911 or 1912, and to Mrs. F. S. Thornton the lot just north of Barbaree's lot in 1896, the latter lot being now owned by respondent Mrs. Forsyth. When these lots were sold Mrs. Griffin says there was a fence considered the dividing line between these lots and the R. D. Smith lot on the west, and that the fence has been there as long as she can remember. Answering the seventh interrogatory, this witness states: "Yes, we used the premises back to the line fence as it now stands, residing at the time in the Barbaree house, and using the Forsyth lot as a garden lot. It was our intention to use this property back to this fence as our own, and we did so. To my certain knowledge, we used, held and occupied this property up to the line fence, as it now stands, for fifty years or longer. No, the owners of the R. D. Smith lot never used any part of the what is now known as the Barbaree or Forsyth lots during the time we lived there. Yes, the owners of the R. D. Smith lot, so far as I know, accepted the line fence, as it now stands, as the dividing line between these two properties, for they never made any objection to it. I have been back to Union Springs several different times during the past fifteen years, and in passing back and forth have noticed this property, and the line fences as I have seen them, run along the same lines as when my mother owned this property." Mrs. Griffin further testified that when she and her mother conveyed these lots, as above indicated, they pointed out how far the lots "ran back, and indicated the fence as the line and put them in possession of the lots back to the fence"; and that after again viewing these lots in recent months and the present line fence and the old land marks, the witness gives it as her belief that the fence, as it now runs, is the same as when she and her mother lived there.

It must be conceded the testimony of this witness, apparently disinterested, and who was not cross-examined, must be given much weight upon the issue of fact here presented.

Another wholly disinterested witness, Mrs. Ravenscroft, adds corroboration to the testimony of Mrs. Griffin. Mrs. Ravenscroft lived in the house on the Forsyth lot from 1916 to 1925. She remembers the fence line as it was when she lived there, and has viewed the lot recently. It is her opinion, and she gives some reason for the conclusion, that the present fence is practically on the same line as it was when she was living there, though admitting there could be some variation. But the witness persisted in saying that when the fence was put back it was, according to her recollection, placed on the same line.

Mrs. Forsyth moved on her lot in 1925, and says the fence is in the same place, and that this has reference also to the fence along Barbaree's lot. She claimed all of the lot enclosed in that fence. Barbaree purchased his lot in 1912, and he says the fence line then was right where it is now, and without change. He too has been in possession of his lot, claiming it as his own, as enclosed in this fence since his purchase. In addition, Barbaree also shows that a barn was erected on his lot on the southwest corner twenty-three years ago, and the fence connects with the barn on the northwest corner. Other evidence tends to show that the line insisted upon by complainant and established by the decree will take in some 4½ or 5 feet of this barn.

The testimony of respondents, Barbaree and Forsyth, corroborated by witness Caylor, and not disputed by any one, establishes the further fact that along the line of this fence there is a natural terrace, higher by 3 or 4 inches on respondents' side of the fence than on the other.

As opposed to the proof for respondents, as above outlined, and as confined to the line fence, complainant offered one Bradberry who resides on the lot just south of Barbaree, and to the east of the lot of complainant. Bradberry is interested in the result, having contracted with complainant to purchase a portion of her lot. He has resided on his lot nine years, and

thinks the fence was "reset" on the Barbaree lot about a year ago, in that, the fence on the north corner of the Barbaree lot was set back 2½ feet, though remaining the same at the south corner. He also thinks an old chinaberry stump gives indication the fence was changed, and this stump is about 16 feet from the present fence. He admits the natural terrace along the fence, and that the barn is not on the true line, as he measured it; and he did not know whether Barbaree or Mrs. Forsyth had a fence line when they moved there, nor where the fence line was when Mrs. Ravenscroft lived there.

Witness Branscomb, for complainant, lived on the lot now owned by Mrs. Forsyth twenty-nine or thirty years ago, and it is his judgment the fence has been changed, based upon his remembrance of an old well which he states was then 12 or 15 feet from where it is now. The fence, all agree, now runs along very near the edge of this old well. He had not seen the fence line "since he left there twenty-nine years ago, until the other day."

As to the location of the well, Mrs. Ravenscroft states the well was in close proximity to the fence when she lived there from 1916 to 1925. Branscomb was corroborated as to the well's location by witness May, who lived on complainant's lot eighteen or twenty years ago, but who gave it only as his best recollection. Barbaree and Mrs. Forsyth insist the well all along has been close to the fence, within 2 feet.

It appears that in September 1929, respondent Barbaree entered into an arbitration agreement with Ogletree, Bradberry and Mason as to their dividing line. But this particular line was not involved, and we think that this arbitration agreement should not be accorded much consideration on this particular hearing.

We have attemped a brief outline of the proof for the respective parties in view of our disagreement with the finding of the court below. And upon careful consideration of all the evidence by the court in consultation, we find our minds irresistibly drawn to the conclusion that the line, as it now exists, and as now indicated by the dividing fence, has been considered by these respondents as embracing their property and as held by them under claim of ownership for more than ten years, openly and with no indication that it originated in any mistake. We are persuaded too that this line fence has been so established for more than twenty years, and the property embraced therein adversely held for that length of time, and more. Though there was no agreement as to the line, yet it clearly appears there was never any objection raised or its correctness questioned during all these years until very recently.

Under the circumstances as we here find them, the title thus acquired by adverse possession is not to be affected by any inquiry as to what respondents might or might not have claimed, had they known they were or might be mistaken. This long continued, exclusive actual possession, unquestioned until a short time prior to this suit, sufficed to establish a prima facie presumption of its adverse character, with but faint rebutting evidence to the contrary. Shepherd v. Scott's Chapel, supra; Brantley v. Helton, supra.

The rule of repose has here a field of operation. Of course, if, as complainant argues, the proof sufficed to show a gradual change of the dividing line, and a gradual encroachment upon complainant's property throughout the years, an entirely different situation would be presented. But when we consider the testimony of Mrs. Griffin and the other witnesses, as above outlined, as to the length of time this fence has been where it now is and considered the dividing line, the argument for complainant falls to the ground. In the main, it rests upon the recollection of two witnesses as to the location of an old well, which we must consider as of too unstable a character upon which to rest a conclusion as to the location of the line fence. But we forego further discussion.

We conclude the decree was laid in error, and must be reversed. A decree will be here entered in favor of respondents establishing the line by the fence which now divides the property.

Reversed and rendered.

THOMAS, BOULDIN, and FOSTER, JJ., concur.