65 So.2d 494

## SPRADLING v. MAY.

### 2 Div. 308.

Supreme Court of Alabama.

May 14, 1953.

Chester Austin, Birmingham, and Marcus McConnell, Jr., Livingston, for appellant.

12

Ira D. Pruitt, Livingston, for appellee.

SIMPSON, Justice.

P. B. May filed this bill against E. F. Spradling to establish a dividing line—in dispute—between their coterminous lands. Title 47, Chapter 2, Art. 1, Code 1940. The court established the line claimed by May and Spradling has appealed.

The decree is to be accorded the usual presumption attending its correctness. The evidence was submitted ore tenus in open court and the conclusion on the facts has the force and effect of a jury verdict. In the light of the presumption, we have concluded that to disturb the finding of the court would be without warrant. The case was one purely of fact to be resolved on a consideration of the testimony of the witnesses. So, with that court's superior knowledge of the *locus in quo* gained from being on the ground, so to speak, and hearing the witnesses testify, as we have said in many previous cases, he must have been better advantaged than we to arrive at a correct solution of the perplexing question.

The area between the two disputed boundary lines comprises about 72.5 acres in the south portion of the north half of Fractional Section 16 and 4.5 acres off the north side of the south half of Fractional Section 16, Township 20 North, Range 1 West, Sumter County, Alabama. The common source of title originated in 1911 by a decree of the chancery court of Sumter County whereby Emma W. Scarborough and her children were invested with title to the "N½ of Fractional Section 16, Township 20, Range 1 West, and 4½ acres off the north side of the S½ of Fractional Section 16" and whereby W. W. Winslett was invested with title to the "S½ of Fractional Section 16, Township 20, Range 1 West, less 4½ acres off the north side of the S½ of said Section lying and being in Sumter County." Pursuant to this decree deeds were exchanged by the Scarboroughs and Winslett conveying each to the other the respective lands set out in

the decree. Thus was the boundary line between the two tracts of land established, resulting that title to the disputed area was thereby vested in the Scarboroughs.

Appellee May claims this as the boundary line and relies upon an unbroken chain of record title and possession originating from that common source. His title comes from a conveyance of the property in November, 1943, by one Nixon who received a deed from the Scarboroughs in June, 1943. The description in both deeds was in accordance with that in the decree of 1911 investing the Scarboroughs with title.

Appellant Spradling relies upon a deed from said Winslett dated December 20, 1924, and an unbroken record chain of title thenceforth, together with adverse possession. His chain of title through Winslett is as follows: Winslett to Willis in 1924; Willis to his daughter, Maggie W. Cathey, by will probated in 1929; Maggie W. Cathey to appellant Spradling February, 1942. The description of the lands in Fractional Section 16 in the deed from Winslett to Willis and from Cathey to Spradling was a departure from the established line between the coterminous owners and conveyed the disputed area to which they had no record title, and in addition thereto several other distinct and separable tracts of land, comprising altogether 1043.43 acres. The 1043.43 acres is described in these two deeds as being in accordance with a map and survey made by M. E. Sumner, county surveyor, in 1924, attached to and made a part of the conveyances and recorded with them.

The incipiency of the trouble, of course, was when Winslett, though having no title to any part of the north half or to the 4.5 acres in the north part of the south half of Fractional Section 16, proceeded to deed to Willis not only the 4.5 acres in the south half, but also the acreage in the north half of Fractional Section 16. This conveyance was clearly abortive to convey a good paper title and in order to support his claim of title Spradling, as stated, is relying on adverse possession.

It would be purposeless to detail the evidence, so we will refer to it but briefly. The evidence for the appellant to support his claim of adverse possession tended to show: After receiving his deed from Winslett in 1924, Willis placed a concrete post on the bank of the river at a point where the north line of the disputed area touched the river and also erected concrete posts at other points around the 1043.43 acres in accordance with the survey of Mr. Sumner mentioned in his deed from Winslett. Witness Cathey, brother-in-law of Mrs. Cathey, Spradling's grantor, testified that Willis showed him the posts and pointed out the lines and that his brother, Mrs. Cathey's husband, built a fence along the new line surveyed by Sumner more than ten years before the litigation was commenced; that Cathey operated a cattle farm on the large tract of land (just where is not clear), using some of the disputed area as a cattle run or pasture when it was not overflowing; that Mr. Cathey erected a camp house and built a small lake on the large acreage purchased from Willis, but this was several miles from the land in question; appellant Spradling, after his purchase, farmed a part of the large tract of land for a while, hunted on it, sold timber from it and leased the swamp one year. Spradling and his predecessors in title assessed and paid the taxes, but the Scarboroughs did likewise. The evidence does not make it altogether clear exactly all of the acts it is claimed were exercised over "Big Swamp," as we understand it, the property in dispute, except that it was used for a cattle run, more or less spasmodically, and perhaps appellant may have sold some timber from it and leased it for one year. One difficulty with appellant's evidence is that no differentiation seems to have been made in the testimony between the possessory acts claimed to have been exercised over Big Swamp and the remaining 1043.43 acres which Winslett deeded to Willis and Mrs. Cathey deeded to Spradling. The witnesses generally referred to the property as the Winslett place. We specifically point this out in view of a controlling principle of law to be later adverted to.

The trial court in a lengthy decree reciting the pertinent evidence to sustain it ruled that Spradling had not sustained his

burden of proving title by adverse possession superior to the unbroken record title of May. The land in controversy was proven to be wild swamp land along the Tombigbee River, which during the rainy season each year was overflowed and was practically inaccessible; the Scarborough family had exercised possessory acts over the 152.5 acres allotted to them by the 1911 decree, but the disputed area being so inaccessible it was not susceptible of much or notorious acts of possession and the real owners visited it at only infrequent intervals. But the Scarboroughs and their successors were claiming it as evidenced by various conveyances and otherwise. In 1927 one of the Scarborough children conveyed her interest in the property to Mrs. Emma W. Scarborough, using the same description as carried in the 1911 decree; in 1921 another of the children executed a power of attorney to his mother granting her the right to convey his interest in the timber; in 1930 Emma W. Scarborough et al. conveyed the timber to E. L. Bruce & Company; in 1936 Mrs. Scarborough and the other title holders conveyed the timber to Bell-Hunnicutt Lumber Company. In 1941 her son conveyed his interest in the land to Mrs. Scarborough and in June of 1943 Mrs. Scarborough and a daughter, the then title owners of the property, conveyed the entire title to Nixon. In 1943 Nixon conveyed the timber on the land to Mico Log & Timber Company and in the same year mortgaged the land to McMillan & Company. In 1943 he conveyed the entire property to appellee May. During their ownership, Mrs. Scarborough and her children also leased the property to one Neal, who farmed it. He cut timber in the swamp for the purpose of keeping up the improvements and the fences repaired. He rented portions for several years. He and his tenants hunted on the land. The purchasers of the timber cut and removed timber from some of the 152.5 acres, but it appears they did not cut in the big swamp because of apprehension of Cathey's claim. There was testimony that the true dividing line was the Scarborough line established in 1911. Witness Greenleaf helped run this line. Other witnesses, including Mr.

Reed, county surveyor, testified there were blazes and other marks designating this original line. Many witnesses testified that the disputed land was wild river swamp land and inaccessible except during the dry season and then not accessible by any means of vehicular transportation, the land being full of timber and undergrowth. It is clear that May, Nixon and the Scarboroughs have claimed title to all of the land, including that in dispute, as described in the 1911 decree and in Winslett's deed given to them pursuant to the decree; that they used it for hunting purposes, have leased it on several occasions, farmed a part of the property adjacent to it, given timber deeds to it, and generally exercised such acts of ownership and possession over it as that kind of land was susceptible of. As stated, these record owners have also assessed the land regularly for taxes.

■ Where one claims title to land through an unbroken chain of record title against another who relies upon adverse possession under color of title, the rule is well established. A very strict burden to establish his title rests upon the one claiming by adverse possession.

■ The law places such a high dignity upon a regular documentary title and requires such strict formalities to evidence it that a necessary concomitant is that in order to work a divesture of that title by adverse possession, all the essential elements must be proven by the stated measure of proof, and that proof must show that there has been an actual occupancy, clear, definite, positive, notorious, continuous, adverse and exclusive for the requisite period under claim of right of the definite tract involved.

Following are some of the authorities: Walthall v. Yohn, 252 Ala. 262, 40 So.2d 705; Turnipseed v. Moseley, 248 Ala. 340, 27 So.2d 483, 170 A.L.R. 882; Barbaree v. Flowers, 239 Ala. 510, 196 So. 111; Murphy v. Leatherwood, 221 Ala. 61, 127 So. 843; McDaniel v. Sloss-Sheffield Steel & Iron Co., 152 Ala. 414, 44 So. 705; Chastang v. Chastang, 141 Ala. 451, 37 So. 799.

■■ It is also the established law that rare and widely separated acts, regardless

of how clearly they might have indicated a purpose to claim title, do not show a possession in wild land sufficient for the purpose of acquiring title by adverse possession. The possession must be continuous. Tensaw Land & Timber Co. v. Rivers, 244 Ala. 657, 15 So.2d 411. Also, occasional acts of entry upon land and cutting timber or other desultory entries and acts over the land are not sufficient to show possession against the true owner so as to ripen into title by adverse possession. Green v. Marlin, 219 Ala. 27, 121 So. 19; Williams v. Lyon, 181 Ala. 531, 61 So. 299; McCreary v. Jackson Lumber Co., 148 Ala. 247, 41 So. 822.

It must be borne in mind that the appellee and his predecessors in title were the holders of the legal title and their possessory acts over a part of the land described in their deed from Winslett and in the decree of 1911 is deemed in law as constructive possession of all of the land therein described not actually in the adverse possession of another, and hence their possessory acts over any of the property described in the chain of title was extended to "Big Swamp." Turnipseed v. Moseley, supra.

It is argued that appellant is protected by the general rule that where, one entering under color of title in good faith upon a tract of land, his adverse occupancy of a part thereof would be extended to that not adversely occupied by another to the boundaries described in his color of title and that, therefore, the possessory acts exercised by appellant and his predecessors in title over some of the 1043.43 acres extended this possession to "Big Swamp," to which they held no real paper title. Marietta Fertilizer Co. v. Blair, 173 Ala. 524, 56 So. 131, and cases of similar import. But there is a limitation on this general rule recognized as existing where the conveyance is of separate and distinct tracts of land to only some of which the grantee becomes invested with legal title and the actual occupancy is only to those latter tracts. In such cases the true owner of the tract not in actual occupancy is not disseised and possession under color of title is not extended to include the tract not in actual occupancy as against the true title holder. The acreage in dispute which some of the witnesses have designated as "Big Swamp" is described in the conveyance from Winslett to Willis and from Cathey to appellant as a distinct and separate parcel of land and is therefore governed by the stated exception and no constructive possession is extended to that area by the possessory acts exercised over the remainder of the large acreage. Green v. Marlin, supra; Marietta Fertilizer Co. v. Blair, supra; Henry v. Brown, 143 Ala. 446, 39 So. 325; Crowder v. Doe ex dem. Tennessee Coal, Iron & R. Co., 162 Ala. 151, 50 So. 230; Woods v. Montevallo Coal & Transportation Co., 84 Ala. 560, 3 So. 475.

Another proposition advanced by appellant is that when the deed from Winslett to Willis was filed for record, which had attached to it the accompanying map of Sumner purporting to mark out the lines of the property, it was notice to the Scarboroughs and their title successors of the adverse claim to the disputed area. We do not regard this position as sustainable. The conveyance to appellant Spradling was by Cathey, the grantor who was not a successor in interest to Mrs. Scarborough, and the same is true as to the conveyances by Willis to Cathey and by Winslett to Willis, and not being within Mrs. Scarborough's chain of title, she was bound by no constructive notice by the recordation of these deeds. "The record of a deed from any other person than the grantor from whom title is claimed will not operate to give constructive notice to a subsequent grantee." Tennessee Coal, Iron & R. Co. v. Gardner, 131 Ala. 599, 601, 32 So. 622; Sutley v. Dothan Oil Mill Co., 235 Ala. 475, 481, 179 So. 819.

This principle is analogous to our recording statutes where it is held that the constructive notice designed by them is to protect subsequent purchasers and lienholders of real estate to the result here that Mrs. Scarborough would in no sense be bound by any constructive notice by the subsequent recordation of Winslett's deed to Willis or Mrs. Cathey's deed to appellant. Pittman v. Pittman, 247 Ala. 458, 25

So.2d 26; Ellis v. Womack, 247 Ala. 254, 23 So.2d 859; Larkins v. Howard, 252 Ala. 9, 39 So.2d 224, 7 A.L.R.2d 541; Blocker v. Boyd, 242 Ala. 345, 6 So.2d 19; Code 1940, Title 47, §§ 102 and 120.

We will also take notice of another proposition argued by appellant, which is likewise without merit. The contention is that the deeds executed by the Scarboroughs to Nixon and by Nixon to May were void as against the adverse claim of Spradling, who, it was claimed, was in possession of the disputed property. The rule has been otherwise since the Code of 1907, § 3839, now Code 1940, Title 7, § 938. The prevailing rule is that the deeds were not affected as to validity by the possession of the grantor or that of a party claiming under adverse possession. Rountree v. Jackson, 242 Ala. 190, 4 So.2d 743; Blakey v. State, 205 Ala. 105, 87 So. 409.

Concededly, this inaccessible river swamp land was not susceptible of many acts of possession of any kind and it does not appear that either of the parties or their predecessors in title exercised many acts of possession over it. The building of a fence by Cathey along the Sumner line and its re-establishment by the appellant did tend to show a claim of adverse possession, but just when that fence was constructed is the subject of conflicting testimony. There was evidence to sustain the finding of the trial court that "it was not more than ten years prior to the time the complainant called the matter to the attention of the respondent." Moreover, the mere fact that Cathey did build the fence with the thought of constructing it on the Sumner line did not of itself constitute adverse possession of someone else's property. From aught appearing, he might not have intended to claim to that line if it should later have been discovered it was beyond the true boundary. Smith v. Cook, 220 Ala. 338(9), 124 So. 898.

It is also true that a property owner has a duty of exercising ordinary diligence in looking after his property so as to prevent others from acquiring title by adverse possession, but the nature of notice or knowledge which is to be imputed to a property owner is governed by the character and location of the land involved. And as regards the instant property, we cannot say with any degree of certainty that the conclusion of the trial court was palpably wrong in finding that the possessory acts over Big Swamp claimed to have been exercised by the appellant or his predecessors in title were not sufficient notice to appellee's predecessors in title to preclude a just contention of ignorance of any claim of an adverse holding.

Under the guiding rule governing our review as first mentioned hereinabove, we are unable to pronounce error in the finding below.

Affirmed.

LIVINGSTON, C. J., and GOODWYN and MERRILL, JJ., concur.