This is a boundary-line dispute between adjoining landowners whose deeds indicate that the United States government section line dividing Section 22 and Section 21, Township 5 South, Range 7 East of the Huntsville Meridian is the boundary line between their properties. Charles E. Shirey owns property in section 21; Charles H. Pittman and Shelby Pittman own the property immediately to the east of Shirey's property in section 22. The evidence was undisputed that sometime between 1985 and 1987, a fence was constructed between the parties' lands ("the Pittmans' fence"). The circumstances surrounding the erection of the fence, however, were highly disputed.
After an ore tenus proceeding and two views of the properties, the trial court determined that the boundary line was located slightly to the west of the section line, pursuant to an agreement between the parties concerning "the 1985 fence," i.e., the Pittmans' fence. The trial court's judgment includes the following extensive findings of fact:
 "The Court heard widely divergent testimony from the parties and the witnesses.
 "The subject parcels of realty lie adjacent to the section line dividing Section 22 and Section 21, Township 5 South, Range 7 East of the Huntsville Meridian. The parties' deeds call for this section line to be the boundary between them. However, by the undisputed testimony of the [Pittmans], the section line has not been treated as the boundary since at least 1961, when the [Pittmans] went into possession of their realty. The acknowledged boundary since at least 1961 has lain west of the section line. The [Pittmans] testified that they treated and acknowledged one or more of the old fences as the boundary, as did [Shirey's] predecessor in interest.
 "The most recent fence was constructed in 1985, by the [Pittmans'] testimony; or in 1986 or 1987, according to [Shirey]. The subject fence is hereinafter referred to as the `1985 fence.' [Shirey] states that the 1985 fence was intended to be a temporary fence and that the parties had agreed it would be placed in this location only until the true boundary line could be surveyed and a permanent fence placed on the true boundary line. Apparently, [Shirey] took no steps until 2005 to have the `true boundary' surveyed, which survey led to the present dispute.
 "The 1985 fence is constructed of what was alternatively referred to as `hog wire' or `web wire.' The Court knows it as `page wire' and will so refer to it herein. The page wire is topped with one or more strands of barbed wire. It is strung along metal T-bar fence posts; in places round, 6- or 8-inch creosote-treated fence posts are used as stretcher posts. On the far south side of the fence row viewed by the Court, large posts made from railroad crossties were used.
 "Two or three other fences run parallel to the 1985 fence, but are much older and are to the west of the 1985 fence. *Page 486 
Those old fences are mostly on the ground and in places mesh together; in other places the old fences are gone altogether. Trees and brush obscure most of the old fences, as well as some of the 1985 fence.
 The [Pittmans] and Rena Lee [the Pittmans' employee] testified that the parties agreed to fix the line and erect a fence thereon in 1985. They testified further that [Shirey] himself participated in this project by selecting the location for the fence along the line; by helping erect the fence; by paying for fifty [percent] (50%) of the materials; and that he `shot' the line with a transit, in order to place it in a straight line, which line was intended by the parties to constitute the property line between them. [Shirey] denied all this, except for the testimony that he shot the line with a transit, which he admits.
 "The 1985 fence is clearly not of a `temporary' nature. The expensive building materials used to erect it and care shown by both parties to see that it was erected in a straight line belie the assertion that was intended to be a temporary fence. Additionally, the Court is of the opinion that the 1985 fence was intended by the parties to be the common boundary line between the two parcels. [Shirey] shot the line himself and established its location on the ground. He is held to the line that he himself established.
 "Instructively, . . . Mr. Pittman testified that he knew that he was `losing' or `giving up' territory when he agreed to place the line along the location of the 1985 fence, because he was consenting to a relocation of the common boundary to the West and onto property he had considered his since 1961. Moreover, the parties have by their actions acknowledged the 1985 fence as the boundary line for approximately twenty years. No step was ever taken to survey the `true boundary' and move the fence there until 2005."
From a judgment determining the boundary line to be the Pittmans' fence, Shirey appealed to the Alabama Supreme Court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.
 Standard of Review
"Where a trial court hears ore tenus testimony [in a boundary-line case], . . . its findings based upon that testimony are presumed correct, and its judgment based on those findings will be reversed only if, after a consideration of all the evidence and after making all inferences that can logically be drawn from the evidence, the judgment is found to be plainly and palpably erroneous." Bearden v. Ellison,560 So.2d 1042, 1043 (Ala. 1990). The presumption of correctness accorded to the trial court's findings based on evidence presented ore tenus "is particularly strong in boundary line disputes and adverse possession cases, and the presumption is further enhanced if the trial court personally views the property in dispute. Wallace v. Putman, 495 So.2d 1072, 1075
(Ala. 1986)." Bell v. Jackson, 530 So.2d 42, 44
(Ala. 1988).
 "The [ore tenus] presumption developed in our law because the trial court has the benefit of seeing and hearing the evidence presented, and, therefore, is a better judge of the credibility of witnesses and the accuracy of certain evidence presented than is an appellate court. The cold record before an appellate court, no matter how meticulous its transcription, is incapable of truly reflecting certain human actions and reactions that occur during a trial. The special nuances of the human voice and the infinite number of human facial expressions are incapable of transcription, *Page 487 
and, yet, we recognize them as frequently highly indicative of credibility. In addition, in adverse possession cases, the special nature of much of the evidence presented makes clear transcription difficult. Witnesses frequently testify to the existence of `lines, locations, distances, monuments, culverts, fences and the like' by pointing or verbally referring to a diagram. Barnett v. Millie, 286 Ala. 681, 684, 246 So.2d 78, 80 (1971). . . . An appellate court is without the benefit of the `pointing finger or any information which enables [it] to determine the particular line, location, distance, monument, culvert or fence to which the witness referred.' Id. Accordingly, the ore tenus presumption of correctness as to the trial court's findings of fact is `especially strong in adverse possession cases.' Scarbrough [v. Smith, 445 So.2d 553] at 556 [(Ala. 1984)]."
Lilly v. Palmer, 495 So.2d 522, 525-26 (Ala. 1986).
 Analysis I. Permissive vs. Hostile Possession
Shirey first argues that the Pittmans' possession of the property that is west of the section line and enclosed by the 1985 fence was permissive rather than hostile and, therefore, that it could not have ripened into title by adverse possession. In support of that argument, Shirey points out the following unrefuted testimony:
 "Q. [By Pittmans' counsel:] Did you ever object to Mr. Pittman's placement of the fence?
 "A. [By Shirey:] No, sir, he had my full permission.
 "Q. Did you ever object to him running cattle or livestock or hog —
 "A. No, sir.
 "Q. — on the property?
 "A. He had my permission to use it, and he was to use it until such time as the property line was surveyed.
 "Q. You're saying he did this permissively?
 "A. Yes, sir."
The general rule with respect to permissive possession of land was stated in Moss v. Woodrow Reynolds Son TimberCo., 592 So.2d 1029, 1031 (Ala. 1992):
 "Generally, possession of land entered into with permission of the owner will not ripen into title. Wallace v. Putman, 495 So.2d 1072, 1076
(Ala. 1986); Howell v. Bradford, 570 So.2d 643, 645 (Ala. 1990). However, in a boundary dispute, the coterminous landowners may alter the boundary line between their tracts of land by agreement, possession for 10 years, or by adverse possession. Kerlin v. Tensaw Land Timber Co., 390 So.2d 616, 618
(Ala. 1980); Wallace v. Putman, 495 So.2d 1072, 1076 (Ala. 1986). In order to change possession from permissive to adverse, the possessor must make a clear and positive disclaimer or repudiation of the true owner's title. The possessor must give the true owner actual notice of such disavowal, or he must manifest acts or make a declaration of adverseness so notorious that actual notice will be presumed. Enterprise Lodge No. 352 of the Knights of Pythias, Inc. v. First Baptist Church (Colored) of Evergreen, 292 Ala. 579, 581, 298 So.2d 17, 19
(1974); Calhoun v. Smith, 387 So.2d 821, 824
(Ala. 1980); Marino v. Smith, 454 So.2d 1380, 1382 (Ala. 1984)."
The Alabama Supreme Court has long recognized that a boundary-line dispute between coterminous landowners is subject to "`a unique set of requirements that is a hybrid of the elements of adverse possession by prescription and statutory adverse *Page 488 
possession.'" See McCallister v. Jones,432 So.2d 489, 491 (Ala. 1983) (quoting Kerlin v. Tensaw Land Timber Co., 390 So.2d 616, 618 (Ala. 1980)). InMcCallister, our supreme court explained:
 "`In the past there has been some confusion in this area, but the basic requirements are ascertainable from the applicable case law. In a boundary dispute, the coterminous landowners may alter the boundary line between their tracts of land by agreement plus possession for ten years, or by adverse possession for ten years. See Reynolds v. Rutland, 365 So.2d 656 (Ala. 1978); Carpenter v. Huffman, 294 Ala. 189, 314 So.2d 65 (1975); Smith v. Brown, 282 Ala. 528, 213 So.2d 374 (1968); Lay v. Phillips, 276 Ala. 273, 161 So.2d 477
(1964); Duke v. Wimberly, 245 Ala. 639, 18 So.2d 554 (1944); Smith v. Bachus, 201 Ala. 534, 78 So. 888 (1918). But see, Davis v. Grant, 173 Ala. 4, 55 So. 210 (1911). See also Code 1975, § 6-5-200(c). The rules governing this type of dispute are, in actuality, a form of statutory adverse possession. See Code 1975, § 6-5-200(c); Berry v. Guyton, 288 Ala. 475, 262 So.2d 593
(1972).'"
432 So.2d at 491 (quoting Kerlin,390 So.2d at 618-19). See also Johnson v. Brewington, 435 So.2d 64,65 (Ala. 1983). Perhaps the best explanation of how an agreement by adjoining landowners to locate a boundary-line fence can ripen into title after 10 years was provided by an early Alabama Supreme Court decision, Brantley v. Helton,224 Ala. 93, 139 So. 283 (1932). In that case, the court explained:
 "Adverse possession as between adjoining landowners, where a question of boundary line is presented, has been many times declared by this court. When the parties agree upon the location of a line fence, or one of them proceeds to inclose his property, and erects a fence intended as line fence, holds actual and exclusive possession to it as such, his possession is adverse, and, if continued for ten years, ripens into title.
 "If the location of the fence is merely tentative, not intended to define a permanent boundary, and possession is taken, not under claim of title to the fence, but merely to the true line, to be thereafter ascertained, such possession is not adverse.
 "The controlling fact is one of intention. The mere fact that a mistake was made in locating the boundary, and there was never an intention to claim the property of another, does not negative adverse possession. Such a rule would make adverse possession to depend upon bad faith.
 "Was there an intention to fix a dividing line, each to have the enjoyment of his own property, and was possession taken and held accordingly, each claiming the property held as his own, because he considered it his own? If so, the possession is adverse. Of course, adverse possession may arise from boldly and knowingly taking the property of another, or taking it regardless of whether he believes it is his, thus ousting the true owner, and holding in hostility to him.
 "But in law a hostile possession is not limited to any such case. It is hostile when held as his own, claimed as his own, whether by mistake or willfully.
 "There are certain cases of entry under the owner, or in recognition of joint ownership, and the like, when notice of a hostile possession must be brought home to the owner; but in boundary line cases, the inclosure of valuable lands . . . and appropriation of same to a beneficial enjoyment, carries notice of an adverse *Page 489 
claim to the adjoining owner, or puts him on inquiry." 224 Ala. at 95-96, 139 So. at 285. See also Turner v. DePriest, 205 Ala. 313, 87 So. 370 (1921).
Because the trial court in the present case found as facts that the parties (1) "intended [the Pittmans' fence] to be the common boundary line between the two parcels," and (2) acknowledged that fence as the boundary line for more than 10 years, the elements of statutory adverse possession were established.
 II. Period of Possession
Shirey next argues that the Pittmans' claim to ownership of the disputed tract rests upon a 20-year rather than a 10-year period of possession and that the Pittmans did not establish possession of the disputed property for the requisite 20-year period. He contends that § 6-5-200, Ala. Code 1975, which establishes a 10-year period for acquiring title by adverse possession, does not apply to coterminous landowners by virtue of subsection (c) of that statute. Section 6-5-200 provides, in its entirety:
 "(a) Adverse possession cannot confer or defeat title to land unless:
 "(1) The party setting it up shall show that a deed or other color of title purporting to convey title to him has been duly recorded in the office of the judge of probate of the county in which the land lies for 10 years before the commencement of the action;
 "(2) He and those through whom he claims shall have annually listed the land for taxation in the proper county for 10 years prior to the commencement of the action if the land is subject to taxation; or
 "(3) He derives title by descent cast or devise from a predecessor in the title who was in possession of the land.
 "(b) If the period during which the party's deed or color of title has been on record, added to the time during which the deeds or color of title of those through whom he claims have been on record, amounts to 10 years, he may defend or prosecute on his adverse possession, and an inadvertent failure to list the land for taxation, any unintentional mistake in the description of the assessment or unintentional omission of any part of it from the assessment during the period of 10 years shall not bar the party of his action or defense on his adverse possession.
 "(c) This section shall not be construed to affect in any way a title perfect by adverse possession before the adoption of this Code, nor to deprive any person of his rights under Sections 6-6-286 through 6-6-289, nor to affect cases involving a question as to boundaries between coterminous owners."
Subsection (c) of § 6-5-200 does not mean that a coterminous landowner may not acquire title by adverse possession for 10 years. See Tidwell v. Strickler,457 So.2d 365, 368 (Ala. 1984). Instead, it means that the coterminous claimant "need not prove either a deed or color of title to the property, annual listings for taxation, or descent or devise from a predecessor in order to maintain his claim.Mardis v. Nichols, 393 So.2d 976 (Ala. 1981)."Id.
The judgment of the Jackson Circuit Court is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
 BRYAN, J., concurs in the result, without writing. *Page 490